# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### – BROWNSVILLE DIVISION –

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal B-07-232** |
| | § | |
| **JOHN CRAIG ZIMMERMAN** | § | |

## MEMORANDUM OPINION AND ORDER

The United States indicted John Craig Zimmerman ("Zimmerman" or "Defendant") on four counts for violations of the Child Pornography Prevention Act ("CPPA"): two counts for sexual exploitation of a child in violation of 18 U.S.C. § 2251(a) (2000);[1] one count for receiving child pornography in violation of 18 U.S.C. § 2252A(a)(2)(B) (2003);[2] and another count for possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) (2000).[3]  After Defendant waived his right to a jury trial, this case was tried to the Court on September 24, 2007.  Defendant stipulated

---

[1] "Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed." § 2251(a).

[2] "Any person who . . . knowingly receives or distributes . . . any material that contains child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer . . . . shall be punished as provided in subsection (b)." § 2252A(a)(2)(B).

[3] "Any person who . . . knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if . . . the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and . . . such visual depiction is of such conduct . . . shall be punished as provided in subsection (b) of this section." § 2252(a)(4)(B).

to every element of each offense except the element of jurisdiction.[4]  Defendant's jurisdictional challenge is twofold.  First, Defendant asserts that Congress does not have the power, pursuant to the Commerce Clause, to regulate, what he contends, was his purely intrastate activity.  Second, Defendant contends that the government could not prove the jurisdictional elements of each of these statutes.  The Court heard evidence at a bench trial,[5] and, for the reasons that follow, overrules both challenges.

## I. FACTUAL BACKGROUND

Defendant Zimmerman was a fire inspector for the Brownsville Fire Department.  Pursuant to an anonymous, but specific, voice message left on the fire department's telephone, the City of Brownsville Management Information System searched Defendant's computer for child pornography on February 6, 2007.  The search revealed pornography, both adult and what the investigators suspected to be child pornography, on the city-owned external hard drive of the computer that Defendant used at the fire department.  The images found on this external hard drive were encrypted, such that special software, which was installed on Defendant's computer, had to be used to decode and view the images.  The Brownsville Police Department ("BPD") was notified of the situation and was given consent to conduct its own search of the computer and external database.  The police, after a thorough search of the external hard drive, discovered multiple images

---

[4] After both Defendant and the government made arguments and presented evidence on the jurisdictional elements of these statutes, the Court indicated that it was overruling Defendant's challenge to jurisdiction.  At this point, the Defendant offered a plea of no contest to all four counts in the indictment, which the Court accepted.

[5] The Court, pursuant to the parties' request, also considered the evidence presented at the suppression hearing in this case held August 6, 2007.  The Court overruled Defendant's Motion to Suppress in an order issued August 22, 2007.  (*See* Docket No. 70.)

of child pornography as well as a receipt for a subscription to a website containing child pornography that, according to one witness, was based outside of Texas. (Trial Tr., Direct Exam. Juan Avalos.)[6]

The BPD then obtained a search warrant for Zimmerman's residence.  The search of the residence  resulted in the seizure of a number of compact disks ("CDs").  Subsequent to the search of Defendant's home, the police telephoned Defendant regarding the location of a laptop that they believed he possessed.  (*Id*.)  Zimmerman indicated that the laptop was broken and was probably in a landfill somewhere.  (*Id*.)  Police also asked Defendant about two computer towers found in his home from which the hard drives had been removed.  (*Id*.)  Defendant stated that those computers had not worked in years, but, according to an Immigration and Customs Enforcement forensics agent, there was evidence that the computers had functioned much more recently.  (*Id*.)  Neither the laptop nor the missing hard drives were ever found by law enforcement.  Nevertheless, the search of Defendant's home uncovered hundreds of images of child pornography, many of which were downloaded from the Internet.  (*Id*.)  The Court was presented with two of these images that had the name of the website from which they originated embedded into the image.  (*See* Exhibits 23A, 24A.)

Also on these CDs, law enforcement found receipts for subscriptions to various websites specializing in child pornography. (*Id*.)  These receipts were sent to Defendant's email address with Zimmerman's name on them, and they confirmed subscriptions to child pornography websites based in various states.

---

[6] When the Court announced this decision, there was no official copy of the transcript of the trial or the suppression hearing.  Where possible, the Court will indicate the witness from whom the referenced testimony was elicited.

The police also discovered seventeen videos on the CDs found at Zimmerman's home. (*Id.*) These videos were noncommercial grade child pornography, and at least one of the videos contained an underage female speaking a language other than English or Spanish that one witness believed to be Russian. (*Id.*)  In addition to these videos, there were other videos containing child pornography which were commercially made, and at least one of these also contained a female speaking in an unknown foreign language.  (*Id.*)

Finally, the search of Defendant's home revealed numerous images of child pornography that Zimmerman created.  Particularly, there was one CD labeled "Belize" that contained multiple pictures of underage females in various states of undress with a landscape that allegedly came from Belize in the background.  (*See, e.g.*, *id.*)  Two victims from these photos testified at trial, and one stated that she had never been to Belize with Defendant, while the other was not asked whether she had ever visited Belize.  (Trial Tr., Direct and Cross Exam. of KF and Summer Evans.)  Based on the evidence, it appears that the image from Belize was placed in the background of the images after Defendant took the nude photos of at least one of the victims.  (*See* Trial Tr. Direct Exam. Juan Avalos.)

## II. CONGRESS HAD THE AUTHORITY TO REGULATE THIS CONDUCT

In *Kallestad,* the Fifth Circuit held that Section 2252(a)(4)(B), which prohibits possession of child pornography, does not reach beyond Congress's power under the Commerce Clause, even when used to reach purely intrastate possession. *United States v. Kallestad*, 236 F.3d 225, 231 (5th Cir. 2000).  In that case, the defendant took pictures of underage girls engaged in sexually explicit conduct.  *Id.* at 227.  The photos and films were made at his home in Texas; however, the

government proved that the actual film used to create the images was manufactured outside of Texas. *Id.* The defendant argued that it was outside of Congress's Commerce Clause power to regulate his purely intrastate possession of this child pornography. *Id.* The Fifth Circuit followed the reasoning in *Lopez* and *Morrison* to determine that the statute was constitutional, even when used to reach intrastate activity. *Id.* at 227-31; *see generally United States v. Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598 (2000).

In *Lopez*, the Supreme Court discussed three categories of activities that Congress may regulate pursuant to its power under the Commerce Clause: (1) channels of interstate commerce; (2) persons or things traveling in interstate commerce; and (3) activities having a substantial effect on interstate commerce. 514 U.S. at 558-59. In *Morrison*, the court expanded on the third category—activities having a substantial effect on interstate commerce. *See generally* 529 U.S. 598. When analyzing this last category, *Morrison* instructs courts to inquire: (1) whether the statute regulates commercial or "economic" activity; (2) whether the statute contains an express jurisdictional element that might limit its reach; (3) whether the legislative history contains congressional findings regarding the effects that the regulated activity has upon interstate commerce; and (4) whether the link between the regulated activity and interstate commerce is too attenuated to be considered a regulation of interstate commerce. *Id.* at 610-12.

The Fifth Circuit in *Kallestad* found that the home production of child pornography was economic in character. *See United States v. Kallestad*, 236 F.3d 225, 228 (5th Cir. 2000). After describing the market for child pornography, the court stated that "when a person produces for their own consumption, a product that is traded in an interstate market, his conduct is economic in character." *Id.* The court then discussed the second *Morrison* factor and determined that Section

2252(a)(4)(B) also contains a jurisdictional nexus. *Id.* at 228-29. This provision makes it a crime to possess child pornography that "has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported." *Id.* at 229; *see also* 18 U.S.C. § 2252(a)(4)(B). The *Kallestad* court next turned to the third *Morrison* factor and discussed the congressional findings. The court found that there were ample congressional findings showing that child pornography is a growing, predatory business which operates across the United States to reach consumers nationwide. *Id.* Lastly, the Fifth Circuit considered the criminalized act's relationship to interstate commerce, i.e., whether "Congress could rationally have determined that it must reach local, intrastate conduct in order to effectively regulate a national, interstate market." *Id.* The Fifth Circuit concluded that it was rational for Congress to have determined that reaching local possession of child pornography was necessary to its objective of eliminating this illegal, interstate market. *Id.* at 231.

Subsequent to the Fifth Circuit's opinion in *Kallestad*, the Supreme Court decided *Gonzales v. Raich*, in which the Court again revisited the third category of activities that Congress can regulate via the Commerce Clause. 545 U.S. 1 (2005). In *Raich*, the Supreme Court was faced with the question of whether Congress had the authority, pursuant to the Commerce Clause and the Necessary and Proper Clause, to prohibit purely intrastate cultivation and use of marijuana through various provisions of the Controlled Substances Act (CSA). *See generally id.* The Court, quoting *Wickard v. Filburn*, stated that "even if [defendant's] activities be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce." *Id.* at 17 (quoting *Wickard v. Filburn*, 317

U.S. 111, 128-29 (1942)[7].  The *Raich* Court went on to state that Congress has the power to "regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut regulation of the interstate market in that commodity."  *Raich*, at 18.

Focusing on the purposes of the two acts, the CSA and the Agricultural Adjustment Act, the *Raich* Court then compared wheat and marijuana.  *Id.* 19-20.  The Court found that, similar to the farmer in *Wickard*, the respondents in that case were cultivating a commodity for home consumption for which there is an established market, even though the market is illegal.  *Id.* at 19.  The Court also noted that "production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity."  *Id.*

The Supreme Court also looked at the legislative history of the CSA, in which Congress indicated the reasons that it felt it appropriate to encompass local activities within the scope of the CSA.  The Court's decision to uphold the CSA provisions in question was, in part, based on the comprehensiveness of the economic component of the regulation, noting that the CSA is a "lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution and possession of . . . controlled substances."  *See United States v. Maxwell,* 446 F.3d 1210, 1214 (11th Cir. 2006)(quoting *Raich*, 545 U.S. at 24). The Supreme Court thus held that "Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA."  *Id.* at 22.

---

[7] In *Wickard*, the Supreme Court upheld the application of certain provisions of the Agricultural Adjustment Act of 1938. *See generally* 317 U.S. 111.  These provisions established an allotment of a certain number of acres for the Filburn's wheat crop that year; however, Filburn grew more wheat than he was supposed to, intending to use the excess for his own consumption on the farm.  *Id.* at 115-17.  The Court held that "Congress may properly have considered that wheat consumed on the farm where grown if wholly outside the scheme of regulation would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices."  *Id.* at 128-29.

After the Court decided *Raich*, numerous courts have applied the same rationale used in *Raich* to hold certain provisions of the CPPA constitutional, even when those provisions are used to regulate intrastate possession, receipt, and production of child pornography.[8]  In fact, each circuit faced with this question post-*Raich* has held the CPPA provisions to be constitutional.  *See supra,* n. 8.  The Fifth Circuit has not addressed this issue since *Raich,* but considering that the court's holding in *Kallestad* parallels that in *Raich* and the holdings in those cases applying *Raich* to the CPPA, the Fifth Circuit appears to be in line with the other circuits that have addressed the question.

This Court is bound by the Fifth Circuit's decision in *Kallestad*, upholding the constitutionality of Section 2252(a)(4)(B) even when applied to purely intrastate possession.  Therefore, the following discussion refers only to whether the prohibitions against receipt and production of child pornography under  Sections  2251(a) and 2252A(a)(2)(B) are constitutional even when used to reach intrastate incidents of child pornography.  This Court, following *Raich* and *Kallestad*,[9] finds these provisions to be a constitutional exercise of the Commerce Clause and

---

[8] *United States v. Maxwell,* 446 F.3d 1210, 1217-19 (11th Cir. 2006)(holding Section 2252A(5)(B) constitutional as applied to defendant's intrastate possession of child pornography after the Supreme Court remanded the Eleventh Circuit's prior holding for reconsideration in light of *Raich*); *United States v. Smith,* 459 F.3d 1276, 1285 (11th Cir. 2006)(finding Sections 2251(a) and 2252A(a)(5)(B) constitutional as applied to intrastate production, pursuant to *Raich*); *United States v. Chambers,* 441 F.3d 438, 454-55 (6th Cir. 2006)(analogizing the child pornography statutes to the CSA); *United States v. Sullivan,* 451 F.3d 884, 889-92 (D.C. Cir. 2006)(comparing child pornography to marijuana, and upholding the CPPA as constitutional using the reasoning from *Raich*); *United States v. Jeronimo-Bautista,* 425 F.3d 1266, 1273 (10th Cir. 2005)(rejecting a Commerce Clause challenge to the CPPA in light of *Raich*); *United States v. Forrest,* 429 F.3d 73, 78-79 (4th Cir. 2005)(relying on *Raich,* holding that Congress had a rational basis for concluding that intrastate manufacture and possession substantially affects interstate commerce).

[9] The Supreme Court, in deciding *Raich,* notably did not use the four factors derived from *Morrison* as the Fifth Circuit did in *Kallestad.*  In a footnote, the Eleventh Circuit recognized the omission of these factors from *Raich,* noting the "potential confusion that may arise from the now unclear status of the four *Morrison/Lopez* factors post-*Raich.*"  *United States v. Maxwell,* 446 F.3d 1210, n. 6 (11th Cir. 2006).  That court declined to adopt a general theory for when those factors apply, but stated that the question before the court, regarding certain provisions of the CPPA, did not involve a "single-subject statute whose single subject is non-economic."  *Id.*  Thus, the Eleventh Circuit followed the *Raich* analysis, rather than the *Morrison* factors.  *Id.*  While some would consider it unclear as to when, or if, these four factors apply after *Raich,* this Court will proceed in the discussion of the provisions at hand within the framework of *Raich,* but notes that the result would be the same if the Court used the *Morrison* factors, since the analysis would parallel the Fifth Circuit's in *Kallestad.*  As stated above, the Fifth Circuit's decision regarding the constitutionality of

Necessary and Proper Clause, even when regulating intrastate production and receipt of child pornography.

The present case is similar to *Raich*; the only difference is the illegal commodity regulated. Similar to the CSA, which the Supreme Court described as a "lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution and possession of . . . controlled substances," the CPPA is part of a comprehensive regulatory scheme prohibiting the receipt, distribution, sale, production, possession and solicitation of child pornography. *See* 18 U.S.C. §§ 2251-2252A; *see also Raich*, 545 U.S. at 24. In both the CSA and CPPA, Congress exercised its power under the Commerce Clause and the Necessary and Proper Clause to regulate "quintessentially economic" activities—"the production, distribution, and consumption of commodities for which there is a lucrative, interstate market." *See Raich*, 545 U.S. at 26; *see also* S. REP. No. 95-438, at 5 (1977), *reprinted in* 1978 U.S.C.C.A.N. 40, 42-43 (noting that child pornography is a nationwide, multimillion dollar industry). The D.C. Circuit noted that the economic effects of intrastate production and possession of child pornography "appear to be even more compelling than those in *Raich* and *Wickard*" because "the supply of electronic images of child pornography has a viral character. . . ." *United States v. Sullivan*, 451 F.3d 884, 891 (D.C. Cir. 2006). That court explained that while transfers of marijuana and wheat subdivide an existing cache, transfers of digital pornographic images multiply the existing supply. *Id.* This Court finds this especially true in light of the ease with which these pornographic images can be and are exchanged via the Internet.

---

Section 2252(a)(4)(B) is binding on this Court, and need not be revisited. The other two provisions, however, have not been expressly upheld by the Fifth Circuit; thus, this Court's discussion will center around those two provisions as viewed within the *Raich* framework.

In *Raich,* the Supreme Court analogized the intrastate manufacture and production of marijuana to the *Wickard* farmer's cultivation and use of the additional wheat crop. *Raich*, 545 U.S. at 17. The intrastate production and receipt of child pornography fits squarely into that same analogy. Like wheat and marijuana, Defendant possessed, "for home consumption, a fungible commodity for which there is an established, albeit illegal, interstate market." *Id*. at 18. The production of a commodity meant for home consumption—be it wheat, marijuana, or child pornography—has a substantial effect on supply and demand in the national market for that commodity. *See id*. at 19.

The Supreme Court in *Raich* also looked to the legislative history of the CSA to reach the conclusion that "Congress had a rational basis for believing that the failure to regulate intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." *Id*. at 22. In enacting the CPPA, Congress noted that "child pornography . . . [has] become [a] highly organized, multimillion dollar industr[y] that [operates] on a nationwide scale."[10]   S. REP. No. 95-438, at 5 (1977), *reprinted in* 1978 U.S.C.C.A.N. 40, 42-43. Additional findings supporting subsequent amendments to the Act state, "the existence of . . . child pornographic images . . . inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography. . . ." S. REP. No. 104-358, at 2, *available at* 1996 WL 506545. Furthermore, Congress articulated its belief that "prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material thereby helping . . . to eliminate the market for sexual exploitation of children . . . ." *Id*. at 3. In 2006, Congress issued findings specifically addressing the

---

[10] In fact, this Court's anecdotal experience would suggest that it operates on a world-wide scale.

effects that intrastate incidents of child pornography have on the interstate market for child pornography.  Child Pornography Prevention Act, Pub. L. No. 109-248, 120 Stat 587 (2006).  The findings state that federal control of intrastate incidents of child pornography is "essential to the effective control of the interstate market in child pornography."  *Id.*

This Court, following the framework set out by the Supreme Court in *Raich*, finds that Congress had a rational basis for believing that failure to regulate the intrastate receipt and production of child pornography would leave a gaping hole in the CPPA.  *See Raich,* 545 U.S. at 22.  The fact that the application of these statutes, Sections 2251(a) and 2252A(a)(2)(B), could "ensnare some purely intrastate activity is of no moment."  *See Raich*, 545 U.S. at 22.  Congress identified a national concern that is "quintessentially economic"—child pornography.  It is not irrational for Congress to conclude that its inability to regulate the intrastate existence of child pornography would undermine its broader regulatory scheme, designed to eliminate the child pornography market in its entirety.  *See id.*  For the foregoing reasons, the Court finds that Sections 2251(a) and 2252A(a)(2)(B) are constitutional as applied to Zimmerman.


## III. THE GOVERNMENT MET ITS BURDEN

The second part of Defendant's argument is that, even if Congress had the power to regulate this conduct via the Commerce Clause, the government, nevertheless, failed to meet the jurisdictional requirements set forth in the statutes. Each of the statutes in the indictment contains a jurisdictional element that the government must prove to obtain a conviction for a violation of the statute.

**A. 18 U.S.C. § 2252A(a)(2)(B)**[11]

Count three charges Defendant with receipt of child pornography in violation of Section 2252A(a)(2)(B). This count reads, in pertinent part, "Defendant . . . did knowingly receive material . . . comprising child pornography that had been mailed, shipped, and transported in interstate commerce by any means, including computer . . . ." (Indictment, at 2.)

The government presented various pieces of evidence to prove that Zimmerman received child pornography that traveled through interstate commerce. First, the government presented evidence that Zimmerman subscribed to child pornography websites that were based outside of Texas. (*See* Trial Tr., Direct Exam. Juan Avalos.) For example, the government offered a receipt for a subscription to a website, "Vlad Models." (*Id.*) The top-level domain for this site is ".ru." (Exhibit 36, 36A.) This is a country-specific top-level domain, indicating that this is a Russian-based website. Second, the government presented the court with evidence that Defendant downloaded images from the Internet. The government offered two images from another website to which Zimmerman subscribed called "LS Models." (Trial Tr., Direct Exam. Juan Avalos; Exhibits 23A, 24A.) These images were imprinted with this website's logo and were located on one of the CDs found in Defendant's residence. (Trial Tr., Direct Exam. Juan Avalos; Exhibits 21, 23A, 24A.) This embedded website, the government argued, showed that the images came from the Internet and thus traveled through interstate commerce. Third, the government presented evidence that Zimmerman possessed foreign-made films. The government offered evidence of pornographic videos, of both commercial and noncommercial grade, in which underage girls were speaking a language other than English or Spanish. (Trial Tr., Direct Exam. Juan Avalos.) A witness testified

---

[11] The Court addresses count three first because the discussion of this offense will serve as a foundation for the Court's analysis of the other counts in the indictment.

that the girls might be speaking Russian in at least one of the videos.  (*Id*.)  Lastly, after establishing that some of the pornographic photos and videos were not manufactured by Zimmerman, the government solicited testimony that most child pornography, if not homemade, is usually traded via the Internet.  (Trial Tr., Cross Exam. Juan Avalos.)

The government's proof of the jurisdictional element of this provision centers on the Internet. The Fifth Circuit has stated that "transmission of photographs by means of the Internet is tantamount to moving photographs across state lines and thus constitutes interstate commerce . . . ."  *United States v. Runyan*, 290 F.3d 223, 239 (5th Cir. 2002).  The Fifth Circuit went on to state, "when the interstate commerce element of § 2252A is established via Internet transmission, the government must 'independently link all the images upon which a conviction is based to the Internet' in order to obtain a conviction."  *Id*. at 240 (quoting *United States v. Henriques*, 234 F.3d 263, 266 (5th Cir. 2000)).  Circumstantial evidence, however, may be sufficient to meet this burden as long as the government makes a specific connection between the images produced at trial and the Internet.  *Id*. at 242.  In *Runyan*, the court cleared up some apparent confusion that resulted after its previous decision, *Henriques*, regarding whether circumstantial evidence was sufficient to establish the jurisdictional nexus.  *See id*.  In this discussion, the Fifth Circuit mentions, by way of example, that the presence of a website embedded in the image would be sufficient circumstantial evidence to prove the jurisdictional element and support a conviction.  *Id*.  In *Runyan*, the government introduced images at trial which had website logos and advertisements embedded in them.  *Id*. Based on the embedded words in these images, the Fifth Circuit held that this evidence alone was sufficient to support the defendant's conviction for receipt and possession of child pornography. *Id*.

In the present case, the government offered evidence establishing that Defendant subscribed to a website, LS Models, which contained child pornography.  (Trial Tr., Direct Exam. Juan Avalos; Exhibit 21.)  The government then presented the Court with two pornographic images of underage girls with the LS Models website logo embedded into the photo.  (Trial Tr., Direct Exam. Juan Avalos, Cross Exam. Juan Avalos; Exhibits 23A, 24A)  This Court finds, based on the embedded website logo, that these two photos traveled through the Internet.[12]  Thus, this Court, pursuant to Fifth Circuit precedent, finds that the government proved, beyond a reasonable doubt, that Zimmerman received an image of child pornography that was transported through interstate commerce.

## B. 18 U.S.C. § 2251(a)

Counts one and two charge Defendant with producing visual depictions of a minor engaging in sexually explicit conduct in violation of Section 2251(a).  The jurisdictional nexus in each of these counts requires that, "such visual depiction hav[e] been produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer."[13]  (Indictment, at 1-2).  Other courts have noted that this "limiting jurisdictional factor

---

[12] There was additional evidence that at least some the images of child pornography traveled through the Internet.  For example: (1) Defendant's expert at the suppression hearing testified that the images likely came from the Internet; (2) there was evidence that Defendant subscribed to websites containing child pornography, and at least one such website was based in Russia; and (3) Defendant agreed that many of the images came from the Internet, by agreeing that the government's statement of facts recited prior to entering his plea was true. As part of the factual summary, the government stated, "the defendant had, in an external hard drive that he used at his work computer, over 200 images of child pornography.  Those images having -- he received through the Internet. . . ." Defendant then agreed that this summary was accurate. (Trial Tr.)

[13] The pertinent part of the statute reads, "Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (e), . . . if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer . . . ." 18 U.S.C. § 2251(a).

14

is almost useless here, since all but the most self-sufficient child pornographers will rely on film, cameras, or chemicals that traveled through interstate commerce." *United States v. Holston*, 343 F.3d 83,89 (2nd Cir. 2003)(quoting *United States v. Rodia*, 194 F.3d 465, 473 (3rd Cir. 1999)). In fact, to establish this jurisdictional nexus, the government often simply proves that either the film, camera, or processing materials traveled through interstate or foreign commerce.[14]

The government in the present case, however, failed to present any evidence regarding where the camera, film, or other developing equipment were manufactured. The government, instead, tried two other approaches. The government's first theory was that the CDs and hard drives on which the images of child pornography were found, traveled through interstate commerce. The second theory that the government put forth was that there was an image of Belize in the background of a number of images; thus, the government argues, this background image necessarily traveled through interstate commerce, satisfying the jurisdictional element.

To support its first theory, the government offered evidence indicating that the CDs on which some of the images were found were Verbatim brand CDs, and Verbatim does not manufacture any disks in the United States. (Trial Tr., Cross Exam. Juan Avalos.) The government also put forth evidence showing that the external hard drive, on which other pornographic images were found, was manufactured in Singapore by Western Digital. (Trial Tr., Direct Exam. Juan Avalos) In addition,

---

[14] *See, e.g., United States v. Fadl*, No. 06-3166, 2007 WL 2363185, at * 2 (8th Cir. Aug. 21, 2007)(showing that a camera had crossed state lines was sufficient); *United States v. Smith*, 459 F.3d 1276, 1282 (11th Cir. 2006)(affirming conviction where government proved that some photos were printed on paper that had traveled across state lines using equipment that had also traveled through interstate commerce); *United States v. Gann*, No. 04-5840, 3006 WL 3528917, at *2 (6th Cir. Dec. 21, 2005)(upholding conviction where government showed, *inter alia*, that video camera and digital camera were manufactured out of state); *United States v. Jeronimo-Bautista*, 425 F.3d 1266, 1268 (10th Cir. 2005)(demonstrating that camera had traveled through interstate commerce was enough); *United States v. Hoggard*, 254 F.3d 744, 746 (8th Cir. 2001)(showing that film and camera were transported through interstate commerce satisfied jurisdictional requirement); *United States v. Robinson*, 137 F.3d 652, 653-54 (1st Cir. 1998)(using camera and instant film made in another state satisfied the jurisdictional nexus).

the government solicited testimony that the computer's internal hard drive is a Maxtor, which is manufactured outside the United States.  (*Id*.)

In addressing the government's first theory, the Court is faced with two questions: (1) whether the government met its burden of proving that these items, the CDs and hard drives, have been "mailed, shipped, or transported in interstate or foreign commerce," and (2) if any of these items did travel through interstate commerce, were those items "materials" used to "produce[]" the visual depictions in question.

The Court can briefly dispose of the first question.  The record clearly indicates that the CDs, hard drive, and external hard drive were manufactured outside of the State of Texas.  There was no evidence introduced to the contrary.  The Court is persuaded that the government proved this beyond a reasonable doubt.

The next question requires this Court to determine whether CDs or hard drives are materials that can be used to produce visual depictions, as those terms are used in Section 2251(a).  There has not yet been a Fifth Circuit case addressing this issue; however, other circuits have faced this question and have come to varying conclusions.

In *United States v. Wilson*, the defendant was convicted of production of child pornography. 182 F.3d 737, 740-41 (10th Cir. 1999).[15]  At trial, the government introduced diskettes which contained visual depictions of child pornography.  *Id*. at 740-43.  Similar to the case at hand, the Tenth Circuit faced the question of whether these visual depictions contained on the diskettes were "produced" using materials that traveled through interstate or foreign commerce.  *Id*. at 741.  The government presented two theories to establish this.  *Id*. at 742-43.  The first was that "the diskettes

---

[15] The statute that Wilson was convicted of violating was 18 U.S.C. § 2252(a)(4)(B), which has the exact same jurisdictional element as Section 2251.

were 'materials' that traveled in interstate commerce and were used to produce the visual depictions at issue." *Id*. at 742.  The court rejected this theory because the government's evidence did not support the conclusion; however, the court did "not foreclose the possibility that a diskette is a 'material' used to produce a graphic file" if the government produced sufficient evidence to show this.  *Id*. at 743.  The government's second theory was that "the act of converting a computer graphics file stored on a diskette into a visual image on a computer monitor could constitute 'production' of a visual depiction for purpose of the statute." *Id*.  The court again left open the possibility of this theory under different circumstances, but the court stated that in that case, the statute required it to "focus on the graphics files as they reside or are contained on the diskettes, and to determine what material went into producing those files." *Id*.  That court held that the "production" occurred either at or prior to the time the graphic files were recorded on the diskettes. *Id*.

The Seventh Circuit in *United States v. Angle*, expressly declined to follow *Wilson*.  234 F.3d 326, 340-41 (7th Cir. 2000).  In *Angle*, the court looked to the definitions in the statute and noted that "produced" is not defined by the statute; however, "producing" is defined as "producing, manufacturing, issuing, publishing, or advertising." *Id*. at 341; 18 U.S.C. § 2256(3).  The Seventh Circuit went on to state that the Tenth Circuit's reading of the term "produced" was too restrictive and rendered meaningless the definition of "producing." *Angle*, 234 F.3d at 341.  In *Angle*, like the present case, it was undisputed that the disks traveled through interstate commerce.  *Id*.  The *Angle* court held that the government met the jurisdictional element because a "reasonable factfinder could find that Angle 'produced' the pornographic files by copying the images on computer diskettes that traveled interstate." *Id*.

17

The Seventh Circuit, in *Angle*, also stated its approval of the Ninth Circuit holding in *United States v. Lacy. See id.*; *see generally Lacy*, 119 F.3d 742 (9th Cir. 1997). In *Lacy*, the government offered undisputed evidence that the defendant's computer, hard drive, monitor, and disks had traveled through interstate commerce. *Lacy*, 119 F.3d at 750. The defendant argued that he was merely copying the visual images he downloaded them. *Id*. The Ninth Circuit disagreed, holding that the images were produced then the defendant used his computer to download the data. *Id*.

Along these same lines, the Eight Circuit recently agreed that Congress intended the term "producing" to have a broad definition. *United States v. Fadl*, No. 06-3166, 2007 WL 2363185, at * 3 (8th Cir. Aug. 21, 2007). In reaching this conclusion the Court noted that the statutory definition included "producing" as well as other words.[16] *Id*. As a result, the Eight Circuit concluded that Congress intended "producing" to have a broad meaning, which includes a traditional definition as well as other activities that one may not generally consider to fall into the typical definition. *Id*.

This Court agrees with the Seventh, Eighth, and Ninth Circuits that the statutory meaning of "produced" should be read broadly. *See United States v. Fadl*, No. 06-3166, 2007 WL 2363185, at * 3 (8th Cir. Aug. 21, 2007); *Angle v. United States*, 234 F.3d 326, 340-41 (7th Cir. 2000); *United States v. Lacy*, 119 F.3d 742, 750 (9th Cir. 1997). The definition of "producing" in the CPPA clearly encompasses more than simply the traditional use of the word. Also, there is an apparent trend to interpret the word "producing" more broadly. This Court is persuaded that "produced" should similarly be given a broader meaning. Furthermore, the Tenth Circuit, even with its narrow

---

[16] That court discussed the term "producing" in a different context than the present one. There the defendant argued that he did not produce the child pornography because he did not have a directorial or editorial role with the ultimate goal of commercial production. Although the context is different, this Court still felt it important to note that other circuits have been reading the statutory term broadly.

construction of the statute, did not foreclose the availability of any of the theories the government posed in that case. Rather, it stated that those theories would not be sufficient in that particular situation. *United States v. Wilson*, 182 F.3d 737, 743 (10th Cir. 1999).

In both *Angle* and *Lacy*, the defendant "produced" the visual depictions at issue by downloading those images onto disks which had traveled through interstate commerce. The present case is analogous. The government proved that various pictures found on the CDs in Defendant's home and on his external hard drive at work came from the Internet.[17] The evidence showed that Zimmerman downloaded these various images from the Internet onto his hard drive, external hard drive, and the CDs. (*See, e.g.,* Trial Tr., Direct Exam. Juan Avalos, Cross Exam. Juan Avalos; Supr. Hr'g Tr.) It is undisputed that these CDs and hard drives traveled through interstate commerce. The Court finds that this act of downloading the images onto items that traveled through interstate commerce means that these visual depiction were "produced using materials that have been . . . transported in interstate or foreign commerce . . . ." *See* 18 U.S.C. § 2251(a). Therefore, the Court finds the government proved the jurisdictional element of this provision beyond a reasonable doubt.

The government also offered images of underage females in various states of undress that were created from photos Defendant took of the minor victims. (*See, e.g.*, Exhibits 30, 33.) Although, as stated above, the government failed to establish that the film, camera, or any other developing materials used to create these images traveled through interstate commerce, the government did establish that law enforcement found these images on CDs that traveled through

---

[17] This Court has already found, beyond a reasonable doubt, that at least two photos came from the Internet. *See supra* Section III A; *see also supra* n. 11.

interstate commerce.[18]    Therefore, following the rationale in *Angle*, this Court finds that the government met the jurisdictional element of Section 2251(a) with regard to these images by showing that Zimmerman copied these images onto CDs that traveled through interstate commerce.

The government's second argument to establish this element relied on the "Belize" photos, i.e., those photos with the background from what appears to be Belize, saved onto the CD labeled Belize. Defendant argued that there was little proof that the background even came from Belize, and he further argued that, even if it did, the Court should not give this significant weight because the background was not the "focal point" of the photos.

The Court rejects Defendant's argument that case law requires that the item traveling through interstate commerce be the "focal point" of the photo. If that were true, merely showing that film or a camera traveled through interstate commerce would not be sufficient to meet this element. The "focal point" language only applies when determining whether an image constitutes a "lascivious display" of genitals as defined by the CPPA. *See United States v. Grimes*, 244 F.3d 375, 380 (5th Cir. 2001). That is not an issue in the present case because of Defendant's stipulations.

The Court agrees, however, that the proof at trial regarding the origin of the background was extremely vague. The Court cannot find that the government proved that this background photo came from Belize. Nevertheless, this finding does not alter the fact that the government proved this jurisdictional element, beyond a reasonable doubt, based on its first theory.

---

[18]    The government proved that Defendant created these images by taking nude photographs of at least one of the minor victims and, using a computer program, superimposed himself into the images. After producing these visual depictions of sexually explicit conduct, Defendant then reproduced these visual depictions by saving a copy of them onto a CD.

**C. 18 U.S.C. § 2252(a)(4)(B)**

Count four charges Defendant with knowingly possessing "films, video tapes, or other matter, namely over 100 images of minors engaging in sexually explicit conduct, that had been mailed, shipped, and transported in interstate commerce and such image was produced using materials which have been mailed, shipped, or transported in interstate or foreign commerce, by any means including by computer."  (Indictment, at 3).  It is well established that a disjunctive statute may be pled conjunctively, but proved disjunctively.  *United States v. Haynes*, 610 F.2d 309, 310 (5th Cir. 1980).  Consequently, in this case, the government must prove only one of the jurisdictional elements in count four in order to obtain a conviction under this count.  *See id.* at 310-11.  Even though this is a different provision than those discussed above, the jurisdictional elements are virtually identical to the jurisdictional components of the statutes discussed previously.[19]

Under the first jurisdictional requirement, the government must prove that the "matter which contains any visual depiction . . .  has been mailed, or has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 2252(a)(4)(B).  This jurisdictional element is analogous to that for the receipt offense, discussed above.  *See supra* III, A.  There, this Court, citing *Runyan*,  found that the government met the jurisdictional element for Section 2252A(a)(2)(B) by introducing two images that had a website logo embedded in them.  The Court found that these two images came

_____

[19] The jurisdictional element of Section 2251(a) requires that the ". . . visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed." § 2251(a). This is almost identical to one of the jurisdictional hooks in Section 2252(a)(4)(B) which reaches any "visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer . . . ." § 2252(a)(4)(B).  The jurisdictional element of 18 U.S.C. § 2252A(a)(2)(B) states, "material that contains child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer . . . ." § 2252A(a)(2)(B). This is, for all intents and purposes, the same as Section 2252(a)(4)(B), which states "matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce. . . ."

from the Internet and therefore, according to Fifth Circuit precedent, traveled through interstate commerce.

Although *Runyan* discussed the requirements to establish the jurisdictional nexus for a violation of Section 2252A, the jurisdictional nexus for the offense discussed in *Runyan* is substantially the same as the jurisdictional element of Section 2252(a)(4)(B), which is the provision at issue in this count.[20]  *See generally United States v. Runyan*, 290 F.3d 223 (5th Cir. 2002). Therefore, for the same reasons that the Court found the government satisfied its burden of proving the jurisdictional element of the receipt offense, i.e., that the two images with the LS Models logo embossed on them traveled through interstate commerce, the Court also finds that the government proved the jurisdictional element of the possession offense, under Section 2252(a)(4)(B), beyond a reasonable doubt.

As the Court finds that the government met its burden of proof on the first jurisdictional nexus, it is unnecessary to discuss the second way in which the government could meet the jurisdictional element.  The Court notes, however, that because the jurisdictional element is so similar to that in Section 2251(a), this discussion would parallel the above discussion of the jurisdictional components of Defendant's production offenses.  *See supra* III, B.

---

[20] Section 2252A(5)(b) reads, "knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer. . . ." Compare to 2252(a)(4)(B), which requires that a defendant "knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer."

## IV. CONCLUSION

The Court finds, beyond a reasonable doubt, that the government met its burden of proving the jurisdictional elements for each of the counts in the indictment.  As stated previously, Defendant orally stipulated to every other element of each of these offenses, and the Court accepted this stipulation.  (Trial Tr.)  Additionally, after the Court overruled Zimmerman's jurisdictional challenge and determined that the government proved the jurisdictional elements of each offense, Zimmerman offered a plea of no contest to each count of the indictment.[21]  (Trial Tr.)  The Court accepted this plea and thereby found Defendant Zimmerman guilty of all four counts charged in the indictment.

Signed this 20th day of December, 2007.

_____
Andrew S. Hanen
United States District Judge

---

[21] The Court notes that even absent the stipulation, the government put forth enough evidence to prove Defendant guilty of all four counts.  The Court would have found Defendant guilty of each count, but did not need to do so because Defendant chose to plead no contest once the Court found that the government proved the jurisdictional elements of each offense.